UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MIGUEL MARRERO MIRANDA,

         Plaintiff,

         - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

         Defendant.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CV-6464 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff *pro se* Miguel Marrero Miranda, proceeding *in forma pauperis*, brings this

action against defendant Carolyn Colvin, Acting Commissioner of the Social Security

Administration (the "Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review of

defendant's determination that he is not entitled to disability insurance benefits under Title XVI

of the Social Security Act. Defendant has moved for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c). (Mot. J. Pls. (Doc. No. 29).) For the reasons set forth

below, defendant's motion is GRANTED.

## BACKGROUND

### I.     Procedural History

On April 21, 2011, plaintiff applied for Supplemental Security Income (SSI), alleging

disability due to bipolar disorder, attention deficit hyperactivity disorder (ADHD), anxiety, poor

memory, poor concentration, limited IQ, and auditory hallucinations. (Admin. R. (Doc. No. 32)

at 152, 217.) Plaintiff alleged that he became completely disabled on March 2, 2006. (*Id.* at

152.) On July 27, 2011, plaintiff's disability claim was denied. (*Id.* at 70.) On August 26, 2011,

plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 20.)

On June 11, 2012, plaintiff received a hearing with the Social Security Administration ("SSA") Office of Disability Adjudication and Review in New York, New York. (*Id.*) ALJ Michael J. Stacchini presided over the hearing where plaintiff, who was represented by an attorney, and an impartial vocational expert testified. (*Id.* at 20 & 30.) On August 10, 2012, the ALJ issued a decision that plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at 20–30.) On September 20, 2013, the Appeals Council denied plaintiff's request for review. (*Id.* at 2–5.) On November 20, 2013, plaintiff filed the instant action against defendant. (Compl. (Doc. No. 1)).

Before the Court is the Commissioner's Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Mot. J.) Defendant maintains that the Commissioner correctly determined that plaintiff was not disabled because the ALJ correctly found that plaintiff was not disabled and the evidence submitted to the Appeals Council would not change the ALJ's decision. (Def.'s Mem. Supp. Mot. J. ("Def.'s Mem.") (Doc. No. 30) at 24, 35.) Plaintiff contends that the ALJ's decision was not supported by substantial evidence on the record. (Compl. at 2.) For the reasons set forth below, the Commissioner's motion is granted.

## II.    Administrative Record

### a.    Non-Medical Evidence[1]

Plaintiff was born in Puerto Rico in 1974. (Admin. R. at 152.) He reported that he is right handed and has a fourth grade level of education. (*Id.* at 48, 218.) Plaintiff's primary language is Spanish. (*Id.* at 216.) However, he reported he could not read or write in Spanish or English. (*Id.* at 222.)

---

[1] A majority of the non-medical evidence comes from plaintiff's undated Disability Report and two Third-Party Function Reports, dated April 11, 2001 and May 9, 2011. (Admin. R. at 208–22, 226–33.) These forms were completed by Jonathon Ortiz from Federation Employment & Guidance Service ("FEGS") WeCare. Because Mr. Ortiz completed the Disability Report on plaintiff's behalf and the Function Reports during or after evaluating plaintiff at FEGS, plaintiff is credited with the statements therein.

Prior to 2006, plaintiff worked as a sandblaster for a gasoline company, as a heavy equipment operator and a handyman for a construction company, as an apartment cleaner, as an employee at a perfume store, and as a warehouse supervisor. (*Id.* at 53–54, 59–60, 218, 553–54.) Plaintiff stopped working on March 2, 2006, due to his alleged disabilities. (*Id.* at 217.) In 2010, he attended a vocational training program and received a certificate in building maintenance as part of a drug rehabilitation program. (*Id.* at 54, 218.) However, he stated that he did not work after the program due to his declining health. (*Id.* at 54.)

Plaintiff claims that he cannot work due to (1) bipolar disorder, (2) ADHD, (3) poor memory, (4) poor concentration, (5) limited IQ, and (6) auditory hallucinations. (*Id.* at 217.) Plaintiff claims that his conditions affect his ability to understand and follow directions, but that he can follow oral instructions to a better extent than he can follow written instructions. (*Id.* at 213.) Plaintiff reported that he is easily distracted and can only pay attention for ten to fifteen minutes increments, but that he is generally able to complete tasks he has started. (*Id.*)

Plaintiff stated that he began "self-medicating" with cocaine and heroin in Puerto Rico, but has been sober for the last several years. (*Id.* at 222, 302, 304.) He also stated that he received mental health treatments in a hospital in Puerto Rico from 1986 to 1991. (*Id.* at 222.) Plaintiff reported that he received no treatment between then and January 2011. In 2011, plaintiff began receiving methadone treatment from Narco Freedom and asthma treatment from the Urban Health Plan. (*Id.* at 221, 234, 245.) On March 14, 2011, he received a mental health evaluation at FEGS. (*Id.* at 220.) Subsequently, he began receiving mental health treatment at Promoting Specialized Care and Health (PSCH), where he was prescribed Seroquel. (*Id.* at 244–45.) Plaintiff reported that the Seroquel has contributed to his loss of appetite and makes him drowsy, which keeps him from going out as much as he used to. (*Id.* at 245–46.)

Plaintiff reported that he has asthma attacks two to three times per week, for which he uses Proventil and Advair. (*Id.* at 234–35.) Plaintiff stated that he has seen an increase in the frequency of his asthma attacks and that they are triggered by small spaces with poor ventilation, smoke, and strong smells. (*Id.* at 234–35.) He also stated that he had no hospitalizations for his asthma in the twelve months prior to the completion of his Function Report on May 9, 2011. (*Id.* at 235.) However, in August 2011, he received treatment at the Bronx Lebanon Hospital emergency room for severe chest pain. (*Id.* at 244.)

Plaintiff lives alone. (*Id.* at 208.) He is able to care for his personal needs and complete household chores. (*Id.* at 209–10.) However, he does not sleep well and has a poor appetite. (*Id.* at 209–10.) He stated that he has lost thirty pounds since January 2011. (*Id.* at 222.) Plaintiff claims that he does not prepare food, but, when he does, it is something light, like a sandwich. (*Id.* at 210.) He goes outside on a daily basis, and is able to use public transportation. (*Id.* at 211.) However, he stated that he often gets distracted while out and finds himself in parts of the city he's never been. (*Id.* at 222.)

Plaintiff shops for groceries once or twice a month and is able to handle a bank account and count change. (*Id.* at 211.) He enjoys running in the park, listening to music, playing video games, and cleaning. (*Id.* at 212.) Plaintiff has stated that his activities have remained the same since he became disabled, and he does these activities to keep his mind occupied. (*Id.*) Plaintiff socializes with other people and does not have problems getting along with others, including authority figures. (*Id.* at 212–14.) However, he has stated that he does not have family in New York and only socializes with the family he rents his room from. (*Id.* at 213.)

### b. Medical Evidence Prior to Plaintiff's SSI Application

Prior to April 21, 2011, the date plaintiff submitted his SSI Application, he received treatment from St. Barnabas Hospital, Narco Freedom, Inc., and the Urban Health Plan.

From September 12 to September 14, 2009, plaintiff received inpatient care at St. Barnabas Hospital for head trauma, shortness of breath, and alcohol withdrawal/polysubstance abuse. (*Id.* at 264–95.) There, he told hospital staff that he had arrived from Puerto Rico the day before his admission and had slept on the streets. (*Id.* at 273.) Plaintiff was admitted to the hospital after being found on the streets with an apparent head injury and low blood pressure. (*Id.* at 271.) Plaintiff's electrocardiogram test results were normal. (*Id.* at 288.) Plaintiff complained of a headache, but denied being assaulted or under the influence of drugs or alcohol. (*Id.* at 273.) Plaintiff had a CT scan of his head and was diagnosed with a head injury, not otherwise specified. (*Id.* at 286.) He was treated with Boostrix, Ativan, Librium protocol, folic acid, thiamine, and Albuterol. (*Id.* at 271.) On September 14, 2009, he was discharged in stable condition with prescriptions for Albuterol, folic acid, thiamine, and multi-vitamins. (*Id.* at 273, 285.) The hospital staff recommended that he follow up with a primary care physician. (*Id.* at 285.)

On April 1, 2010, plaintiff began receiving methadone treatment at Narco Freedom, Inc. (*Id.* at 302.) He stated that he came to the program because he "need[ed] to change [his] lifestyle and stop using drugs." (*Id.* at 304.) During his intake screening, he disclosed that he had relapsed on heroin and cocaine, to which he had first become addicted as a teenager. (*Id.*) He denied having any mental health issues. (*Id.* at 302.)

At Narco Freedom, plaintiff consented to undergo a psychosocial history assessment, which was done the following week. (*Id.* at 303.) At his assessment, he stated that he was three weeks clean from heroin and cocaine and that he smoked daily. (*Id.* at 310.) Plaintiff reported

that he was enrolled in English classes at Bronx Community College and was learning construction plastering. (*Id.* at 308.) He stated that he was receiving treatment for asthma at San Juan Medical Clinic. (*Id.* at 317.) Plaintiff again denied any mental health issues or history of mental health problems, except sporadic, untreated anxiety. (*Id.* at 314.) Plaintiff also reported that he felt excessive guilt and shame and experienced mood swings, both of which he attributed to his drug use. (*Id.*) He reported that he had trouble sleeping, which was unrelated to his drug use. (*Id.*) Plaintiff's clinicians assessed that he had poor social skills and unstable health. (*Id.* at 315.) They additionally noted that plaintiff needed a mental health evaluation. (*Id.* at 316.)

On August 25, 2010, plaintiff presented to the walk-in clinic at the Urban Health Plan, complaining of chest pain, a productive cough, and erectile dysfunction. (*Id.* at 417.) Plaintiff was treated with a nebulizer; prescribed Proventil, Advair, and Avelox; and referred to a cardiologist and a urologist. (*Id.* at 417–18.)

On October 14, 2010, plaintiff returned to the Urban Health Plan seeking prescription refills and a psychiatric referral. (*Id.* at 414, 424.) He reported that he felt anxious and nervous and that he was biting objects. (*Id.* at 415.) He was diagnosed with an anxiety disorder, not otherwise specified, and referred to Bernice Perez, L.M.S.W., for psychiatric treatment. (*Id.* at 413, 415.)

On October 30, 2010, plaintiff reported back to the Urban Health Plan for a mental health screening by Ms. Perez. (*Id.* at 413.) There, he complained of anxiety, depressed mood, poor appetite, and difficulty sleeping. (*Id.*) He reported his methadone treatment at Narco Freedom and denied any prior psychiatric treatment. (*Id.*) Ms. Perez determined that plaintiff required a higher level of care than she could provide and referred him for treatment. (*Id.*)

On November 24, 2010, plaintiff returned to the Urban Health Plan with complaints of pain in his lower extremities and in the left sole of his foot. (*Id.* at 411.) He was given Naproxen and referred for x-rays. (*Id.* at 411, 425.)

On December 30, 2010, plaintiff had another echocardiogram. (*Id.* at 324–25.) He had regular supraventricular rhythm, but poor R wave progression, which the doctors classified as a probable normal variant. (*Id.* at 325.)

On March 24 and March 30, 2011, plaintiff was evaluated at FEGS by case manager Jonathan Ortiz, social worker Rosalina Reyes, Rose Chan, M.D., and Harvey Barash, M.D. (*Id.* at 341–406.) Plaintiff reported that over the past month he had experienced poor concentration, insomnia, forgetfulness, anxiety, fearfulness, and was hearing voices in his head. (*Id.* at 342.) He stated that he had one prior hospitalization for hyperactivity in Puerto Rico sometime in 1986. (*Id.*) He also stated he took Xanax for anxiety until sometime in 1991. (*Id.* at 342–43.) He reported suicidal ideation two years prior, but denied any current suicidal or homicidal intent or plans. (*Id.* at 343, 353.) He stated that he had been hearing voices in the night since the age of sixteen. (*Id.* at 343.) However, in a different form completed the same day, he denied suffering from auditory or visual hallucinations. (*Id.* at 354.)

At FEGS, Dr. Barash observed that plaintiff appeared well-groomed, his manner was cooperative, his thought form was logical, and his thought content was normal; however, his activity was restless, his affect was constricted, his mood was depressed, and he had trouble with simple cognitive exercises. (*Id.*) Plaintiff made mistakes when asked to count backwards, and he was oriented to his city, state, and the year, but not to the month or day. (*Id.*) Plaintiff also could not name the president and could name only one object he was asked to remember after five minutes. (*Id.*) Dr. Barash diagnosed plaintiff with Bipolar disorder, not otherwise specified,

and polysubstance abuse in remission.  (*Id.* at 344.)  He also noted that plaintiff had asthma and a borderline IQ, and that mental retardation needed to be ruled out.  (*Id.*)  Finally, Dr. Barash found that plaintiff's chronic psychological illness, limited IQ and literacy, and reduced ability to sustain concentration and memory made him unable to adhere to a regular work routine, expected to last over one-year.  (*Id.* at 345.)  Dr. Barash recommended psychotherapy and medication.  (*Id.*)

During Dr. Chan's evaluation of plaintiff at FEGS, she noted that plaintiff appeared thin, anxious, depressed, and not well nourished or developed.  (*Id.* at 360.)  Plaintiff was referred for psychiatric treatment at the Urban Health Plan and to an SSI entitlement specialists at FEGS so that an SSI application could be completed.  (*Id.* at 378, 428.)

On April 5, 2011, plaintiff had a physical examination at Narco Freedom as part of his continuing methadone treatment.  (*Id.* at 332.)  The doctor reported that plaintiff's general appearance, speech, thought content and flow, mood, and behavior were normal; his concentration was good; and his affect was appropriate.  (*Id.* at 333.)  Plaintiff was cleared to continue methadone maintenance.  (*Id.* at 335.)

On April 14, 2011, plaintiff returned to the Urban Health Plan for a hepatitis vaccine and a psychiatric referral.  (*Id.* at 408–09.)  He reported that he was diagnosed with anxiety and schizophrenia at FEGS.  (*Id.* at 408.)

### c.  Medical Evidence After Plaintiff's SSI Application

On April 21, 2011, plaintiff submitted his SSI application to the Social Security Agency. (*Id.* at 152.)  Subsequently, he met with several health care providers and consultative examiners.

### i.  Dr. Herb Meadow – Consultative Psychiatrist

On June 17, 2011, Dr. Herb Meadow performed a consultative psychiatric evaluation on plaintiff. (*Id.* at 430–33.) There, plaintiff reported that he had been receiving psychiatric treatment on an intermittent basis since the age of twelve. (*Id.* at 430.) He also reported three prior hospitalizations in Puerto Rico, each preceded by suicidal feelings. (*Id.*) Plaintiff described his depression symptomology as dysphoric moods, crying spells, irritability, diminished self-esteem, and difficulty concentrating. (*Id.*) He stated that he experienced panic attacks, but was unable to describe them. (*Id.*) He denied manic symptoms, but admitted to a history of auditory hallucinations. (*Id.*) Plaintiff reported his history of cocaine and heroin use and that he was three-years clean. (*Id.*) He also reported a family history of psychiatric problems. (*Id.* at 431.)

Dr. Meadow reported that plaintiff's demeanor was cooperative and that his manner of relating was adequate. (*Id.*) In regard to plaintiff's appearance, Dr. Meadow found that he was well groomed; his gait, posture, and motor behavior were normal; and his eye contact was appropriate. (*Id.*) Dr. Meadow reported that plaintiff's speech was fluent and clear and that he used adequate expressive and receptive language. (*Id.*) Dr. Meadow also reported that plaintiff's thought process was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. (*Id.*) Dr. Meadow noted that plaintiff's mood was depressed, but his affect was appropriate. (*Id.*)

During the consultation, Dr. Meadow tested plaintiff's attention and concentration, finding he could count, but made mistakes with simple addition and subtraction. (*Id.*) Dr. Meadow reported that plaintiff's attention and concentration were impaired due to his limited intellectual functioning. (*Id.*) Dr. Meadow additionally tested plaintiff's recent and remote memory skills, which he found were intact. (*Id.*) Plaintiff was able to repeat three out of three

objects immediately and after five minutes.  (*Id.*)  He was also able to repeat four numbers forward and two backward.  (*Id.*)

Dr. Meadow concluded that the results of plaintiff's exam appeared consistent with psychiatric and cognitive problems, but not to an extent significant enough to interfere with his ability to function on a daily basis.  (*Id.* at 432.)  Dr. Meadow postulated that plaintiff would be able to perform the tasks necessary for vocational functioning, but that he might have trouble dealing with excessive stress.  (*Id.*)  Ultimately, he diagnosed plaintiff with schizoaffective disorder; cocaine and heroin abuse, in remission; opioid dependence; and cognitive disorder, not otherwise specified.  (*Id.*)

### ii.    Dr. William Latham – Consultative Internist

The same day, Dr. William Latham performed a consultative internal medicine examination on plaintiff.  (*Id.* at 434–36.)  Plaintiff reported that he had been treated for asthma since childhood and that he had been treated by a psychiatrist for the last twenty-years.  (*Id.* at 434.)  He also reported that he had a learning disability and claustrophobia.  (*Id.*)  He stated that he could perform all activities of personal care and daily living.  (*Id.*)

At the consultation, plaintiff was able to get on and off the exam table without difficulty.  (*Id.* at 435.)  Dr. Latham reported that plaintiff was in no acute distress and was able to walk, squat, and stand normally.  (*Id.*)  Dr. Latham checked plaintiff's chest and lungs, finding no significant chest wall abnormality, normal diaphragm movements, and clear percussion and auscultation.  (*Id.*)  Plaintiff's heart rhythm was regular and he had no abdominal or musculoskeletal abnormalities.  (*Id.*)  Dr. Latham found that plaintiff had a full range of motion in his shoulders, elbow, forearms, and wrists.  (*Id.* at 436.)  Plaintiff scored a five out of five on strength in his upper and lower extremities and grip strength.  (*Id.*)

Dr. Latham diagnosed plaintiff with a history of asthma, depression, multiple substance abuse, and methadone dependence.  (*Id.*)  Dr. Meadow reported that plaintiff's prognosis was stable, and he recommended a psychiatric consultation.  (*Id.*)

### iii.    AstroCare Mental Health – Psycho-Social Assessment

The following day, on June 18, 2011, Elizabeth Martinez, L.C.S.W., performed a psycho-social assessment on plaintiff at the AstroCare Mental Health outpatient treatment program.  (*Id.* at 477–79.)  Plaintiff reported his presenting problems as anxiety, depression, paranoia, poor sleep, anger, impulsivity, feelings of worthlessness, low self-esteem, crying, and sentimentality.  (*Id.* at 477.)

Plaintiff reported that he had a supportive girlfriend for the past year and a fair relationship with his siblings.  (*Id.* at 478.)  He stated that he had a few friends but he was "always alone." (*Id.*)  He stated that he was interested in getting his GED, but wanted to be emotionally stable before pursuing his educational goals.  (*Id.*)  Plaintiff also stated he was interested in returning to work upon achieving mental stability.  (*Id.*)  He reported that his strengths were that he was motivated for change, verbal, and able to participate in his treatment.  (*Id.*)  However, he also reported that because of his depression he did not take care of his activities of daily living.  (*Id.*)

Ms. Martinez diagnosed plaintiff with schizoaffective disorder and asthma.  (*Id.* at 479.)  She found that he would benefit from psychotherapy and medication management in order to function to the best of his abilities.  (*Id.*)

While at AstroCare, plaintiff's social worker called 911 and reported that plaintiff had expressed that he wanted to hang himself.  (*Id.* at 495, 515.)  Plaintiff was then taken to the

emergency department of the North Central Bronx Hospital for a psychiatric evaluation. (*Id.* at 495, 515.)

### iv. North Central Bronx Hospital – Psychiatric Evaluation

At the North Central Bronx Hospital, plaintiff told the ER staff that he was not suicidal and that "they misunderstood me." (*Id.* at 498.) Plaintiff denied wanting to hang himself. (*Id.*) He admitted symptoms of depression and anxiety, and he reported that he had told the AstroCare intake worker that he had suicidal thoughts three months earlier. (*Id.* at 498, 502, 508.)

An attending physician completed Mental Status Examination form for plaintiff. (*Id.* at 505–07.) The physician noted that plaintiff was adequately dressed and groomed; his behavior was cooperative; his eye-contact was normal; and his movements were normal. (*Id.* at 505.) Plaintiff spoke at a normal rate, volume, and rhythm. (*Id.*) He was alert; oriented to place, person, time, and situation; and had no gross deficiencies in his registration, attention and calculation, recall, language, and visual-motor integrity. (*Id.*) Plaintiff's thought process was goal-directed, logical, and spontaneous. (*Id.*) His thought content was rational. (*Id.*) Plaintiff reported no suicidal ideation, no aggressive or homicidal ideation, and no perceptual disorders. (*Id.* at 506.) His mood was depressed, but the physician found no gross impairment in his impulse control, insight, or judgment. (*Id.*) Plaintiff was diagnosed with depression and authorized for discharge. (*Id.* at 506–507.)

Plaintiff's Suicide Lethality Assessment notes "present, but not intense, severe, or constant" symptoms of "despair/mental pain/anguish [and] hopelessness," but no other symptoms. (*Id.* at 508.) Plaintiff was discharged the same day with instructions for aftercare at a mental health outpatient program. (*Id.* at 509.)

### v. AstroCare Mental Health – Mental Status Examination

Plaintiff returned to AstroCare on July 5, 2011 and Ms. Martinez performed a Mental Status Examination, which was reviewed by Hillel Glover, M.D. on August 17, 2011. (*Id.* at 532–42.) At the exam, Ms. Martinez noted that plaintiff appeared older than his actual age and his body build was underdeveloped and thin. (*Id.* at 532.) However, he appeared neat and groomed. (*Id.*) Ms. Martinez described plaintiff's attitude as cooperative, guarded, appropriate, and ill-at-ease. (*Id.*) She also noted that plaintiff was overactive, restless, and hyperactive, but did not display any abnormal movements. (*Id.*) Ms. Martinez found plaintiff to be warm and friendly despite his poor eye contact. (*Id.*) He was distractible, drowsy, and hesitant, but spoke profusely with a normal tone and rhythm. (*Id.*) Ms. Martinez found that plaintiff's mood and affect were happy, irritable, yet depressed. (*Id.*) She found that his range of affect was appropriate to the content of his speech, but his intensity was flat. (*Id.*) Ms. Martinez also found that plaintiff's verbalization was vague and his thought process included persecutory delusions. (*Id.* at 532–33.) She also reported that plaintiff suffered from auditory hallucinations. (*Id.* at 533.)

Ms. Martinez estimated that plaintiff had average intelligence, was capable of abstract reasoning and mental calculations, but had a deficient level of general information. (*Id.*) She reported that plaintiff's memory was impaired, but he could orient to time, place, person, and purpose of their interview. (*Id.*) Plaintiff acknowledged having problems with mental illness and recognized the need for treatment. (*Id.*) Ms. Martinez found his judgment to be impaired in the area of goal directed activities. (*Id.*) She also noted that plaintiff occasionally lost impulse control. (*Id.*) Ms. Martinez reported that plaintiff had suicidal ideation, but not intent. (*Id.*) She

also reported that he did not have homicidal ideation or intent.  (*Id.*)  Ultimately, Ms. Martinez

found that plaintiff was at a low risk for suicide or homicide.  (*Id.*)

### vi.    Thomas Harding, Ph.D. – Medical Consultant

On July 19, 2011, state agency medical consultant Thomas Harding, Ph.D., reviewed

plaintiff's medical records and completed a Psychiatric Review Technique and Mental Residual

Functional Capacity assessment.  (*Id.* at 437–54.)  In the Psychiatric Review Technique, Dr.

Harding found that plaintiff had a mild restriction of activities of daily living, and moderate

difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.

(*Id.* at 447.)

In the Mental Residual Functional Capacity Assessment, Dr. Harding noted the extent

that plaintiff was limited in his abilities related to understanding and memory, sustained

concentration and persistence, social interaction, and adaptation.  (*Id.* at 451–52.)  In regard to

understanding and memory, Dr. Harding reported that plaintiff was not significantly limited in

his ability to understand and remember very short and simple instructions; he was moderately

limited in his ability to remember locations and work-like procedures; and he was markedly

limited in his ability to understand and remember detailed instructions.  (*Id.* at 451.)

In regard to sustained concentration and persistence, Dr. Harding reported that plaintiff

was not significantly limited in his ability to carry out very short and simple instructions; he was

not significantly limited in his ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; he was not significantly limited in his

ability to sustain an ordinary routine without special supervision; he was not significantly limited

in his ability to make simple work-related decisions; he was not significantly limited in his

ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; he was moderately limited in his ability to maintain attention and concentration for extended periods; he was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them; and he was markedly limited in his ability to carry out detailed instructions. (*Id.* at 451–52.)

In regard to social interaction, Dr. Harding reported that plaintiff was not significantly limited in his ability to ask simple questions or request assistance; he was not significantly limited in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; he was moderately limited in his ability to interact appropriately with the general public; he was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; and he was moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.* at 452.)

In regard to adaptation, Dr. Harding reported that plaintiff was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions; he was not significantly limited in his ability to travel in unfamiliar places or use public transportation; he was not significantly limited in his ability to set realistic goals or make plans independently of others; and he was moderately limited in his ability to respond appropriately to changes in the work setting. (*Id.*) Dr. Harding concluded that plaintiff retained the ability to perform simple task work. (*Id.* at 453.)

### vii.    AstroCare – Continuing Treatment

On July 21, 2011, Ms. Martinez completed a quarterly treatment plan review, which was co-signed by Dr. Glover. (*Id.* at 555–58.) She listed plaintiff's diagnoses as schizoaffective

disorder, depression, and a history of drug abuse.  (*Id.* at 555.)  She also reported that plaintiff was diagnosed with asthma and suffered from economic and occupational psychosocial stressors.  (*Id.*)  Ms. Martinez noted that plaintiff would be discharged from his treatment plan when he reported and presented with decreased symptoms of schizoaffective disorder and had remained stable for six months.  (*Id.* at 556.)

On August 23, 2011, Ms. Martinez submitted a letter verifying that plaintiff had been receiving treatment at AstroCare since June 18, 2011 for schizoaffective disorder.  (*Id.* at 470.)  She stated that he was taking 300 mgs of Seroquel and had been compliant with medication management with Dr. Evangelista.  (*Id.*)  She also stated that plaintiff had recommitted to psychotherapy sessions and that plaintiff had reported being motivated for change.  (*Id.*)  On September 16, 2011, plaintiff's dosage of Seroquel was increased to 400 mgs.  (*Id.* at 484.)

On September 20, 2011, Ms. Martinez and Flore Marie Menardy, N.P., completed a Psychiatric Assessment of plaintiff, which was co-signed by Dr. Glover.  (*Id.* at 519–21.)  They reported that plaintiff attended weekly psychotherapy sessions and monthly medication management meetings to address his symptoms of schizoaffective disorder.  (*Id.* at 519.)  Plaintiff reported his symptoms as auditory hallucinations, paranoia, anxiety, depression, feelings of worthlessness, and crying.  (*Id.*)  Ms. Martinez and Ms. Menardy reported that plaintiff's prognosis was fair, but that his impairments were expected to last more than one year.  (*Id.* at 520.)  Plaintiff reported that someone was trying to hurt him, but no other details were given.  (*Id.* at 521.)  He also reported that he was unable to maintain employment due to his schizoaffective symptoms.  (*Id.*)  Ms. Martinez and Ms. Menardy noted that plaintiff was capable of managing benefits in his own best interest.  (*Id.*)

On October 11, 2011, Ms. Martinez completed another quarterly treatment plan review, which was co-signed by Ms. Menardy on October 12, 2011. (*Id.* at 551–53.) Ms. Martinez noted that plaintiff had been more compliant with therapy and medication management sessions. (*Id.* at 551.) Plaintiff continued to report symptoms of schizoaffective disorder and he had made little progress toward treatment goals. (*Id.* at 552–53.)

On January 17, 2012, Ms. Martinez completed another quarterly treatment plan review, which was co-signed by Dr. Glover. (*Id.* at 547–49.) She noted plaintiff had achieved little progress since his last treatment plan review. (*Id.* at 549.)

On April 7, 2012, Ms. Martinez completed another quarterly treatment plan review, which was co-signed by Dr. Glover on April 10, 2012. (*Id.* at 543–45.) Plaintiff reported no change since his last treatment plan review, and, again, Ms. Martinez noted that he had made little progress. (*Id.* at 543–45.) Plaintiff reported continuing symptoms of schizoaffective disorder and agreed to recommit to therapy. (*Id.* at 543.)

### d. The Administrative Hearing

On June 11, 2012, ALJ Michael J. Stacchini presided over plaintiff's hearing at the SSA Office of Disability Adjudication and Review in New York, New York. (*Id.* at 20.) Plaintiff, represented by an attorney, testified at the hearing, as well as Melissa Fass Karlin, an impartial vocational expert. (*Id.* at 44–65.)

### i. Plaintiff's Testimony

Plaintiff testified at his hearing with the assistance of a Spanish interpreter. (*Id.* at 44–57.) He was only able to answer a few simple questions directly in English. (*Id.* at 42–43, 48–98.) Plaintiff testified that he lived alone in a room, where he spent his time watching television and listening to music. (*Id.* at 44.) He stated that he generally stayed in his room, but would

leave for medical appointments or to go to the basketball court.  (*Id.* at 44–45.)  Plaintiff stated

that he no longer went for walks or runs in the park, but that he would sometimes play video

games with his friend's son.  (*Id.* at 55.)  He testified that he used to go outside more often, but

no longer went out as much "[b]ecause they're following – they want to hurt me . . . ." (*Id.* at

45.)

Plaintiff testified that he was no longer dating his girlfriend, but still occasionally saw her

or spoke to her on the phone.  (*Id.* at 46.)  He also testified that he no longer had a good

relationship with his siblings.  (*Id.*)  He stated that he still spoke to his brothers in Puerto Rico

several times a year, but only when they called him.  (*Id.*)  Plaintiff reported that he was no

longer taking English classes, but was on "stand by" with the Welfare Society to enroll in

another class.  (*Id.* at 47–48.)

When asked to explain in his own words why he couldn't work, plaintiff answered that he

couldn't work because his asthma, broken collarbone, fear of tight spaces, inability to ride trains,

nightmares, and feelings that "they're following [him] and they're going to hurt [him]." (*Id.* at

49.)  Plaintiff testified that he had last worked in 2006 in Puerto Rico.  (*Id.* at 53.)  He stated that

he had not worked since coming to America due to his health problems.  (*Id.* at 54.)  He also

testified that he had remained drug free since his initial rehab program.  (*Id.*)  Plaintiff denied

any ER visits in the prior year.  (*Id.*)  He stated that his psychiatric treatment was helping quite a

lot and that his asthma was under control if he followed his treatment, which involved medicine

three times per day.  (*Id.* at 56.)

### ii.  The Vocational Expert's Testimony

Impartial vocational expert Melissa Fass Karlin also testified at plaintiff's hearing.  (*Id.* at

57–65.)  She categorized plaintiff's prior work as a sandblaster, industrial cleaner, and

warehouse supervisor.  (*Id.* at 60–61.)  The ALJ posed a hypothetical involving an individual of plaintiff's age, education, and work experience, who had no exertional limitations but should avoid concentrated exposure to irritants.  (*Id.* at 61.)  The hypothetical also limited the individual to simple, routine, repetitive tasks with only occasional changes in the work setting, only occasional decision-making, and only occasional interaction with the public or with co-workers, other than being present around the co-workers.  (*Id.*)  Ms. Fass Karlin testified that such an individual would not be able to perform any of plaintiff's prior work.  (*Id.*)  However, she testified that such an individual could perform other work, such as medium unskilled work as a hand packager and light unskilled work as a routing clerk or bagger.  (*Id.* at 61–62.)  Ms. Fass Karlin testified that there were approximately 164,343 hand packaging jobs in the national economy with 5768 in the local economy; 220,553 routing clerk positions in the national economy; and 41,916 bagger positions in the national economy with 584 in the region.  (*Id.* at 62.)

The ALJ then posed the same hypothetical with the addition that the individual would be unable to perform even simple, routine, repetitive tasks.  (*Id.* at 62.)  Ms. Fass Karlin testified that there would be no work available for such an individual.  (*Id.*)  When plaintiff's attorney asked about an individual, as described in the original hypothetical, who had to miss two or more days of work per month due to psychiatric limitations, Ms. Fass Karlin responded that there would be no relevant work available for such an individual.  (*Id.* at 63.)

The ALJ next posed the original hypothetical with the addition that the individual would be absent from work one day per month and off task for five percent of the workday, in addition to regularly scheduled breaks.  (*Id.* at 63.)  Ms. Fass Karlin testified that such an individual could perform the work of a hand packager, a routing clerk, or a bagger.  (*Id.*)  However, if the

individual were off task twenty percent of the workday, there would be no work available for such an individual.  (*Id.*)

Ultimately, the ALJ denied plaintiff's claim, finding that Miranda was not disabled during the relevant time period and could perform existing jobs in the national economy.  (*Id.* at 29–30.)

### e.  Non-Duplicative Evidence Submitted to the Appeals Council

Plaintiff submitted additional evidence to the Appeals Council.  Plaintiff submitted records from a June 21, 2011 hospitalization at the Bronx-Lebanon Hospital where he was treated for abdominal pain.  (*Id.* at 561.)  An abdominal CT-scan revealed no acute intraabdominal pathology.  (*Id.* at 562.)  However, the scan revealed a pulmonary nodule at the right middle lobe, for which a follow-up study was suggested.  (*Id.*)   Nurse Menardy authorized a follow-up CT scan for November 5, 2011.  (*Id.* at 577.)

Plaintiff submitted a note showing that on August 8, 2012 plaintiff was seen by psychiatrist Virginia Contreras, M.D. with a follow up confirmed for October 8, 2012.  (*Id.* at 563.)  Plaintiff additionally submitted a note from Urban Health Plan, dated August 29, 2012, stating that plaintiff had been a patient since December 2009 and included information regarding his prescriptions for a nebulizer, Advair, Motrin, Zithromax, Prednisone, Ventolin, Singulair, Cepacol lozenges, and Ibuprofen.  (*Id.* at 565–69, 573–74, 576, 578–79, 581, 583, 603.)

On August 14, 2012, plaintiff was hospitalized at the Lincoln Hospital emergency department due to a groin mass (right inguinal pain with hernia) of two days' duration.  (*Id.* at 584–601.)  There, he stated that the mass was growing and it hurt when he walked and coughed.  (*Id.* at 585.)  Plaintiff reported to hospital staff that he lived with his spouse and child.  (*Id.* at

586.)  He was diagnosed with enlarged lymph nodes.  (*Id.*)  Plaintiff left the hospital voluntarily prior to being treated and against medical advice.  (*Id.* at 600.)

## STANDARD OF REVIEW

### I.       Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  "'[S]ubstantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.* (internal quotation marks omitted).  "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld."  *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)).  "This deferential standard of review does not apply, however, to the ALJ's legal conclusions."  *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010).  Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's]

failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step.  *See Talavera*, 697 F.3d at 151.

**DISCUSSION**

**I.      The ALJ's Determination**

Here, the ALJ properly engaged in the five-step analysis and his determinations are supported by substantial evidence.

After first determining that plaintiff had not engaged in substantial gainful activity since April 21, 2011, the ALJ proceeded to step two and determined that plaintiff was severely impaired by asthma, bipolar disorder, schizoaffective disorder, ADHD, and anxiety. (Admin. R. at 22.) The ALJ did not find plaintiff's history of polysubstance abuse to be a severe impairment, as the evidence showed it "never presented any difficulties in his ability to function" and because plaintiff was no longer using drugs. (*Id.*) These findings were based on and consistent with plaintiff's medical evidence and hearing testimony.

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in Appendix 1 of the SSA's regulations. (*Id.*) The ALJ considered plaintiff's impairments against listings 12.03, 12.04, and 12.06 of Appendix 1, which cover "Schizophrenic, Paranoid, and Other Psychotic Disorders," "Affective (Mood) Disorders," and "Anxiety Related Disorders," respectively. (*Id.*) *See* 20 CFR Part 404, Subpart P, Appendix 1, §§ 12.03, 12.04, 12.06. To meet or medically equal the impairments of listing 12.03, 12.04, or 12.06, plaintiff's impairments must satisfy at least two of the following "paragraph B" criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Admin. R. at 22–23.) *See* 20 CFR Part 404, Subpart P, Appendix 1, §§ 12.03(B), 12.04(B), 12.06(B). If an impairment fails to satisfy the paragraph B criteria,

plaintiff may still meet the requirements of listing 12.03, 12.04, or listing 12.06 if he can meet

the criteria listed in paragraph C of each section.  Under § 12.03(C) a claimant must show a:

> [m]edically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
>> 1. Repeated episodes of decompensation, each of extended duration; or
>>
>> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>>
>> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Under § 12.04(C) a claimant must show a:

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
>> 1. Repeated episodes of decompensation, each of extended duration; or
>>
>> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>>
>> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Under § 12.06(C), a claimant must show that her anxiety results "in complete inability to

function independently outside the area of one's home."

Here, the ALJ concluded that plaintiff's impairments did not satisfy the paragraph B or C

criteria.  (Admin. R. at 23.)  He noted that the medical evidence chronicled plaintiff's recent,

conservative mental health treatment, with no indication that plaintiff was suffering from adverse

side-effects from his medication management.  (*Id.*)  He also noted that treatment notes indicated that plaintiff was often non-compliant with taking his medicine and attending therapy sessions. (*Id.*)  Upon review of all the evidence and plaintiff's testimony, the ALJ found that plaintiff's mental conditions "resulted in a mild limitation of [plaintiff]'s ability to conduct his activities of daily living; and moderate restrictions in terms of sustaining social functioning and maintaining concentration, persistence and pace."  (*Id.*)  However, these two limitations did not satisfy the paragraph B criteria.  (*Id.*)  The ALJ then found that the evidence failed to establish the presence of any of the paragraph C criteria.  (*Id.*)  In making this finding, the ALJ was "entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983).

Next, the ALJ assessed plaintiff's residual functional capacity ("RFC") and determined that plaintiff could "perform a full range of work at all exertional levels" limited to "simple, routine repetitive tasks; does not require greater than occasional interaction with co-workers and/or members of the general public although he can be present around co-workers; does not require greater than occasional decision-making; and greater than occasional changes in the work setting."  (Admin. R. at 24.)  The ALJ additionally found that due to plaintiff's "asthma, he must avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases and poorly ventilated areas."  (*Id.*)  Finally, the ALJ found plaintiff "would be absent one day a month and would be off-task by 5 percent of the work day in addition to regularly scheduled breaks."  (*Id.*)

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as the opinion evidence presented at plaintiff's hearing.  (*Id.*)  As to plaintiff's mental impairments, the ALJ noted that plaintiff often gave conflicting reports of his

symptoms. (*Id.* at 25.) For instance, plaintiff reported "the absence of any history of mental health issues other than 'sporadic anxiety'" in 2010, but then in 2011 "suddenly reported that he had been hearing voices . . . . for the past 15 years." (*Id.* at 24–25.) The ALJ also chronicled plaintiff's various mental status evaluations where, despite his depressed mood, he had been cooperative and oriented, dressed and groomed appropriately, and exhibited normal behavior. (*Id.* at 25.) In a June 2011 examination, the ALJ pointed out that plaintiff's "limitation to attention and concentration" was appropriately attributed to "his difficulties with math – rather than any psychiatric disturbance." (*Id.* at 26.)

The ALJ next analyzed plaintiff's progress notes from AstroCare. (*Id.* at 25–26.) The ALJ contrasted the progress notes with plaintiff's mental status evaluations. The progress notes "show some episodes of depressed mood and irritability, but largely identify symptoms of hallucination[s], low intelligence, persecutory thoughts, socialization problems and limitations in concentration, attention, and memory that were subjectively reported." (*Id.* at 25.) On the other hand, "objective findings from mental status evaluations identified some disturbance in mood, but failed to demonstrate any overwhelming psychiatric-based dysfunction that would have precluded all vocational functioning." (*Id.*)

The ALJ pointed out that "overall, [plaintiff] was noted to be a friendly and cooperative individual" with normal speech, average intelligence, capable of abstract reasoning and mental calculations. (*Id.* at 25–26.) The ALJ also noted that despite plaintiff's continued "complain[ts] of depression, anxiety, paranoia and auditory hallucinations, he remained non-complaint with medication and therapy." (*Id.* at 26.) In comparing plaintiff's subjective reports of his symptoms with the objective medical evidence, the ALJ found that the medical records failed "to document that any emotional disturbance experienced by [plaintiff] has imposed the severe

26

restrictions to memory, socialization alleged, or daily functioning. Nor does it corroborate a high degree of restriction stemming from paranoid thoughts or auditory hallucinations." (*Id.*)

The ALJ gave "some weight" to Dr. Meadow's June 2011 psychiatric examination, finding that "the opinion is well supported by the substantial evidence of record and [plaintiff]'s extensive activities of daily living." (*Id.*) The opinion indicated that plaintiff's mental impairments "impaired his ability to deal with excessive stress to some degree, but did not significantly restrict his ability to perform all tasks necessary for vocational functioning." (*Id.*)

The ALJ gave "limited weight" to the opinions of Ms. Martinez, Ms. Menardy, and Dr. Glover. (*Id.* at 27.) The ALJ did so because their opinions that plaintiff had significant, if not complete, limitations in vocational functioning "relied heavily on [plaintiff]'s subjective complaints." (*Id.*) An ALJ may properly give less weight to the portions of a medical opinion that are based on a claimant's subjective statements rather than objective findings. *Modest v. Astrue*, No. 09-CV-44, 2012 WL 947652, at *3 (E.D.N.Y. Mar. 20, 2012). The ALJ additionally found that those opinions failed to take plaintiff's activities of daily living into consideration and were often inconsistent with plaintiff's reports of such activities. (Admin. R. at 27.)

As to plaintiff's physical impairments, the ALJ found that "the objective medical evidence does not corroborate contentions of total disability." (*Id.* at 26.) The ALJ based this determination on the medical evidence and plaintiff's testimony. *See Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998) ("Plaintiff's impairment must be compared to objective medical evidence to determine whether a disability exists."). He noted that plaintiff's consultative internal examination failed to identify significant limitations due to plaintiff's asthma or other medical conditions. (*Id.*) The ALJ also pointed out that the evidence provided failed to indicate any limitations from particular exertional activities, such as lifting, carrying,

standing, walking, or sitting.  (*Id.*)  The evidence showed that while plaintiff had been prescribed asthma medication, he continued to smoke cigarettes and suffered no "asthma-related incidences."  (*Id.* at 26–27.)

After consideration of the evidence in the record, the ALJ found that plaintiff was not "totally credible."  (*Id.* at 28.)  The ALJ made this finding, in part, based on plaintiff's contradictory statements throughout the record, such as plaintiff's alternate reporting of having no history of psychiatric illness versus having a long history of psychiatric illness, stemming back to childhood.  (*Id.*)  The ALJ contrasted plaintiff's contention that he suffers a total disability due to an incapacitating emotional disturbance with his reports that he is able to perform household chores, shop for groceries, count change, handle a savings account, take public transportation, groom himself, keep doctor's appointments, read, socialize with others, and play basketball.  (*Id.*)  *See Sligh v. Astrue*, No. 09-CV-3507, 2011 WL 4532601, at *10–11 (E.D.N.Y. Sept. 28, 2011) (finding plaintiff's inconsistent statements regarding the limiting effects of her impairments undermined her credibility).  The ALJ noted that "[i]t seems unlikely that the claimant would fail to take medication, or at least not attend therapy sessions were he experiencing the severe symptoms he reports."  (*Id.*)

At step four, the ALJ determined that plaintiff did not have the RFC to perform any past relevant work.  (*Id.* at 29.)  Finally, at the fifth step, the ALJ determined that there were jobs in the national economy which plaintiff could perform despite his limitations.  (*Id.*)  At this step, the ALJ found that plaintiff had a limited education and a highly limited ability to communicate in English.  (*Id.*)  This finding was consistent with plaintiff's non-medical evidence and hearing testimony.  The ALJ then considered plaintiff's RFC, age, education, and work experience to determine that plaintiff could work in the national economy.  In making this decision, the ALJ

relied heavily on the vocational expert testimony.  (*Id.* at 30.)  *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (finding that an ALJ may rely on vocational expert testimony where "there is substantial record evidence to support the assumption upon which the vocational expert based his opinion").  The ALJ found that even though plaintiff's ability to perform work at all exertional levels was compromised by his mental impairments, he could still make a successful adjustment to other work.  (*Id.* at 29–30.)

Accordingly, the ALJ determined that plaintiff was not disabled since April 21, 2011. (*Id.* at 30.)  The ALJ's narrative properly and adequately explains his conclusion and develops a sufficient record for the Court to determine that the ALJ's ultimate conclusion was based upon substantial evidence.

## II.     New Evidence Submitted to the Appeals Council

In support of his claim for disability, plaintiff submitted new evidence for the Appeals Council's review.  The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Sistrunk v. Colvin*, No. 14-CV-3208, 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'"  *Id.* (quoting *Jones*, 949 F.2d at 60).

In this case, plaintiff submitted records regarding two hospitalizations, for abdominal and groin pain respectively, additional evidence from the Urban Health Plan, and a note from a new

psychiatrist, Dr. Contreras regarding two appointments. Although the majority of this evidence pre-dated the ALJ's August 10, 2012 decision, it did not provide a basis for changing the ALJ's decision.

Plaintiff's two hospitalizations did not relate to his asthma or mental impairments, nor did they concern any injuries alleged to be disabling. In fact, the hospital records evidence another instance of plaintiff being uncooperative with his medical care as he left the hospital against medical advice. (Admin. R. at 600.)

Plaintiff's additional evidence from the Urban Health Plan documented his prescription medications. These prescriptions were primarily for plaintiff's asthma, which the ALJ had already found to be a severe impairment. Plaintiff's evidence regarding his appointments with Dr. Contreras likewise would not have impacted the ALJ's determination because the ALJ was aware plaintiff was participating in mental health treatment. The note confirmed plaintiff's appointments, but did not provide any medical information at all, let alone any new medical information.

The new evidence would not have provided a basis for the ALJ to change his findings or conclusion, or to make any alternative findings. The Appeals Council therefore did not err in declining to consider the new evidence.

## CONCLUSION

For the reasons herein, defendant's motion for judgment on the pleadings is GRANTED and the case is DISMISSED. The Clerk of Court is respectfully directed to enter judgment accordingly, mail a copy of this Memorandum and Order and accompanying Judgment to the *pro se* plaintiff, and close this case.

The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Dated: Brooklyn, New York
      March 27, 2015

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge